**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **CHESWICK PLANT ENVIRONMENTAL REDEVELOPMENT GROUP, LLC** ) | **Case No.: 2:24-cv-1610** |
| ) | |
| **Plaintiff,** ) | **Jury Trial Demanded** |
| ) | |
| **v.** ) | |
| ) | |
| **GRANT MACKAY COMPANY, INC. and CONTROLLED DEMOLITION INC.,** ) | |
| ) | |
| **Defendants.** ) | |

**COMPLAINT**

Plaintiff Cheswick Plant Environmental Redevelopment Group, LLC ("CPERG"), through its undersigned attorneys, for its complaint against Defendants Grant Mackay Company, Inc. ("Grant Mackay") and Controlled Demolition, Inc. ("CDI") (Grant Mackay and CDI are collectively referred to herein as "Defendants") alleges as follows:

**NATURE OF THE ACTION**

1.     CPERG seeks monetary damages from Grant Mackay for various breaches of the latter's contractual obligations and from CDI for negligence and strict liability based on Defendants' improper demolition and implosion of chimneys (the "Stacks") at the site formerly known as the Cheswick Generating Station, located in Springdale, Pennsylvania (the "Station").

2.     On June 2, 2023, Defendants demolished two Stacks at the Station via implosion. Residents in the community have claimed that the implosion caused them property damage and potential health hazards.  CPERG has incurred, and will likely incur, substantial liability for Defendants' failure to perform the Stack implosions in accordance with Grant Mackay's

1

contractual obligations and CDI's duties of reasonable and professional care and in a reasonable manner consistent with industry standards.

3.    Grant Mackay has a contractual obligation to indemnify CPERG for all of the latter's damages and attorneys' fees arising from Defendants' implosion of the Stacks.   Grant Mackay has failed and refused to satisfy, and has breached, this indemnification obligation.

4.    In addition, Grant Mackay has breached another contractual obligation with CPERG by failing and refusing to demolish a boiler house on the Station grounds.

**THE PARTIES**

5.    CPERG is a limited liability company formed under the laws of Pennsylvania.

6.    CPERG is a wholly owned subsidiary of Charah Environmental Redevelopment Group, LLC, a limited liability company formed under the laws of Kentucky.  Charah Environmental Redevelopment Group, LLC, is a wholly owned subsidiary of Charah, LLC, a limited liability company formed under the laws of Kentucky.  Charah, LLC, is a wholly owned subsidiary of Charah Sole Member, LLC, a limited liability company formed under the laws of Delaware.  Charah Sole Member, LLC, is a wholly owned subsidiary of Charah Management, LLC, a limited liability company formed under the laws of Delaware.  Charah Management, LLC, is a wholly owned subsidiary of Charah Solutions, Inc., a corporation formed under the laws of Delaware with its principal place of business in Kentucky.

7.    Upon information and belief, Grant Mackay is a corporation incorporated under the laws of the state of Utah, with its principal place of business in Utah.  It conducts business in Allegheny County, Pennsylvania.

2

8.     CDI is a corporation incorporated under the laws of the state of Maryland, with its principal place of business in Maryland.  It conducts business in Allegheny County, Pennsylvania.

## JURISDICTION AND VENUE

9.     This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the matter in controversy is between citizens of different states and exceeds the sum of $75,000, exclusive of interest and costs.

10.     This Court has personal jurisdiction over Defendants because they operate, conduct, engage in and do business in, and/or have committed tortious acts within, the Commonwealth of Pennsylvania and this judicial district.  Defendants have engaged, and continue to engage, in substantial and not isolated activities within the Commonwealth of Pennsylvania.  As a result, Defendants have intentionally availed themselves of the privilege of conducting business within the Commonwealth of Pennsylvania and this judicial district, have purposefully directed activity at the Commonwealth of Pennsylvania and this judicial district, and have established sufficient minimum contacts with the Commonwealth of Pennsylvania and this judicial district such that Defendants can reasonably and fairly anticipate being haled into this Court.

11.     Venue is proper in the Western District of Pennsylvania pursuant to 28 U.S.C. § 1391(b)(2) as a district in which a substantial portion of the events giving rise to the claims occurred.

## FACTS

### The Cheswick Station

12.     CPERG, a provider of environmental services and byproduct recycling to the power generation industry, acquired the Station on April 6, 2022.

13.     CPERG's intent in acquiring the Station was and is to remediate the property and sell it for future redevelopment and productive use.

14.     Since it acquired the Station, CPERG has retired and decommissioned the coal power plant that once operated there.

15.     Working with subcontractors, CPERG has been in the process of completing demolition of existing buildings, and conducting environmental remediation and redevelopment work, at the Station.

16.     The remediation and redevelopment efforts include the demolition of power plant structures.

### CPERG's Relationship with Grant Mackay and CDI

17.     According to its website, "Grant Mackay is an industry leader when it comes to commercial demolition work."  It also represents that it uses "highly precise demolition techniques to be able to work in close proximity to other buildings."

18.     The "What We Are About" section on Grant Mackay's website states: "At Grant Mackay Demolition Company, we strive to deliver exceptional demolition services to our clients . . . .  Safey is always our top priority, and we take great pride in maintaining a secure and positive work-environment for our employees and those around us.  With a national reach, we have the capability to tackle complex demolition projects of varying scales and bring expertise to communities across the country."

4

19.     On August 5, 2022, CPERG and Grant Mackay entered into a Subcontractor Master Agreement ("Master Agreement").

20.     Pursuant to the Master Agreement, Recital A, Grant Mackay would "perform certain services and work relating to a project at … a job site of CPERG set forth in a separate Work Authorization . . . ."

21.     The parties agreed that "[w]hen CPERG elects to award Work under this Agreement, it will offer to do so by issuing to [Grant Mackay] a written Work Authorization, which shall include, among other things, terms specifying" "[a] full description of the Work." Master Agreement § 3.

22.     Grant Mackay agreed that "TIME IS OF THE ESSENCE" in the performance of the Work under the Master Agreement and Work Authorization. *Id.* at § 4.b.

23.     Subsequently, on January 4, 2023, Grant Mackay and CPERG entered into Work Authorization CH1634-01SC ("Work Authorization").  Under the terms of this Work Authorization and the Master Agreement, Grant Mackay agreed to perform the "[s]tructural demolition of all existing components of [the] Job Site" "down to existing grade . . . ."  The "Job Site" is defined as the Cheswick Generating Station, located at 151 Porter Street, Springdale, PA 15144. *Id*.

24.     In Section 14 of the Master Agreement, Grant Mackay represented that it was "fully experienced, properly qualified, registered, licensed, equipped, organized, and financed to perform the Work . . . under the Contract Documents."

25.     Section 1(b) of the Master Agreement states that the "'Contract Documents' consist of (1) this Agreement . . . : (2) each Work Authorization, (3) the Flow-Down Terms and Conditions, and (4) all drawings (the "Drawings"), specifications (the "Specifications") and the

schedule "Schedule") attached to or described in Attachment G-xx to a separate Work Authorization and incorporated therein by reference and all Drawings and Specifications and Schedules attached or described in the Scope of Work."

26.    Section 1 of the Master Agreement obligated Grant Mackay, *inter alia*, to "provide and furnish all labor, materials, tools, supplies . . . services, facilities, supervision and administration necessary for the proper and complete provision of the Work by Subcontractor and acceptance of the Work by CPERG."

27.    In Section 7 of the Master Agreement, Grant Mackay represented and warranted, *inter alia*: "that . . .

    e.    [Grant Mackay] shall cause the Work to be performed (i) in a competent and professional manner consistent with industry standards, (ii) in compliance with all laws, statutes and regulations, and (iii) in compliance with all requirements and contents of the Contract Documents, including, without limitation, the Scope of Work, the Drawings and the Specifications, the Insurance Requirements, and the Safety Requirements . . .

    g.    [Grant Mackay] has satisfied itself as to the accessibility, general character and physical conditions of the Job Site and the project, the nature and scope of the Work to be conducted at the Job Site and/or in connection with the project . . . , the character of the equipment and facilities needed for the Work, the general and local conditions under which the Work is to be performed, and all other matters which could in any way affect the Work. . . under the Contract Documents or the Fee . . .

    i.    [Grant Mackay] will be liable for all its errors, if any, in judgment relative to the Work . . . .

    j.    [Grant Mackay] will call to CPERG's attention anything of any nature in any drawings, plans, sketches, instructions, information, requirements, procedures, and other data supplied to Subcontractor (by CPERG or any other third party) which it regards in its professional opinion as unsuitable, improper, or inaccurate in connection with the purposes for which such data is furnished."

28.     Section 12 of the Master Agreement states, *inter alia*, "Subcontractor and all Subcontractor Representatives who perform any of the Work hereunder must comply with the environmental, health, safety and security practices and procedures (including, without limitation, Charah's Drug & Alcohol Policy and Charah's safety requirements) required by CPERG (collectively, the "Rules")."  Section 6 of the Master Agreement defines "Subcontractor Representative" as "Subcontractor's employees, Subcontractor's agents, subcontractors, consultants, suppliers, vendors, materialmen, or any person, entity, or other third party used in connection with the Work or provision of the Products, and the employees of each of the foregoing."  CDI was a Subcontractor Representative of Grant Mackay.

29.     Section 9 of the Master Agreement contains a broad indemnity provision, entitled "Indemnity by Subcontractor," that requires Grant Mackay to indemnify CPERG in connection with, *inter alia*, the Work Authorization.  Specifically, Section 9 states:

> Subcontractor shall, at its expense, defend, indemnify and hold harmless CPERG, and its directors, officers, employees, agents, attorneys, assigns, and successors-in-interest ("CPERG Indemnitees") from and against any and all actions, assessments, causes of action, claims, costs, damages, demands, expenses, liabilities, losses, liens and judgments (collectively, the "Claims" and individually, a "Claim") including, without limitation, attorneys' fees and expenses, of any kind, nature or description, arising out of or resulting from any of the following:  (a) an act or omission of Subcontractor or Subcontractor Representative or others for whose acts Subcontractor may be liable; (b) the personal injury or death or damage to property on account of performance of the Work, the Products, or the presence of Subcontractor or Subcontractor Representative on CPERG property or the Job Site; (c) the receipt or use by CPERG of the Products or Work, or the exercise of CPERG's rights hereunder, including, but not limited to, an infringement, violation or misappropriation of any intellectual property rights of any person or entity, including any copyright, patent, trademark, trade secret, service mark or other proprietary rights; (d) any breach of Subcontractor's representations, warranties, covenants or obligations under this Agreement; provided that with respect to Subcontractor's agreement to defend CPERG, CPERG gives Subcontractor written notice of such Claim within such period of time so as not to materially prejudice Subcontractor and cooperates fully at Subcontractor's expense in such defense.  Subcontractor may not settle any Claim giving rise to an indemnification obligation hereunder where such settlement (i) imposes a

7

monetary obligation that is not covered by the indemnification, (ii) imposes any material, non-monetary obligation, (iii) admits any liability on the part of a CPERG Indemnitee, or (iv) does not include an unconditional release of each CPERG Indemnitee without the prior written consent of CPERG, which consent shall not be unreasonably withheld. The indemnification obligations under this Agreement shall not be limited by amount or type of damages, compensation or other benefits payable under any worker's compensation acts, disability benefit acts, other employee benefit acts to any injured employee of either Subcontractor or CPERG. To the extent necessary to permit CPERG to enforce any term, clause, or condition of this Agreement, Subcontractor agrees that with respect to any Claims brought against CPERG, Subcontractor will and does hereby waive as to CPERG any defense it may have by the workers' compensation laws of any state. IT IS THE EXPRESS INTENT OF THE PARTIES THAT FOR THE PURPOSES OF ALL CLAIMS BASED UPON PERSONAL INJURY OR DEATH, PROPERTY DAMAGE, AND BREACHES OF CONFIDENTIALITY ARISING OUT OF OR IN ANY WAY INCIDENT TO SUBCONTRACTOR'S NEGLIGENT PERFORMANCE OF THIS AGREEMENT, SUBCONTRACTOR'S OBLIGATION TO DEFEND, INDEMNIFY, AND HOLD HARMLESS, WILL INCLUDE ITS PROPORTIONATE SHARE OF CLAIMS ARISING OUT OF OR RESULTING FROM CPERG'S CONCURRENT (A) NEGLIGENCE OF ANY TYPE OR DEGREE, (B) STRICT LIABILITY, (B) (sic) TORTS, OR (D) OTHER FAULT OF ANY NATURE.

30.    Pursuant to its obligations under the Master Agreement and the Work Authorization, Grant Mackay determined that demolition of three structures at the Station should be accomplished by implosion, rather than by conventional means.  Those structures were two chimneys (referred to as "Stacks" in the Work Authorization) and the "Hung Boiler Structure" (the "boiler house").  *Id*.

31.    The Work Authorization expressly states that Grant Mackay's obligations include, among others, "Preparation of Hung Boiler Structure, and Stacks for implosion" and "Implosion and cleanup of Boiler Structure and Stacks  . . ."  *Id*.

32.    For this and other related work, CPERG agreed to pay Grant Mackay $7,758,000.00.

33.    Grant Mackay, in turn, contracted with CDI to perform the implosion of the chimneys and the boiler house.

34.     According to the History section of its website, CDI "is internationally recognized as the pioneer of and leader in explosives demolition technology."  The Building section of CDI's website states, "Where construction and space allow, CDI's implosion techniques can fell existing structures to permit site turnaround in weeks instead of months, the shortened duration of noise, dust and traffic congestion offered by CDI's operations also promote positive community relations on the front end of a project that can be carried through the rest of the development for the benefit of the developer or owner."

35.     The Safety section of CDI's website states: "CDI's culture of safety is fundamental to our success.  Each member of our team, from supervisor to crew, is certified in CPR/AED/First Aid, 30-hour OSHA Construction Standards and explosives handling, as well as additional certifications and training in key areas such as the wearing of task specific personnel protective equipment, fall protection, fire protection, materials handling/storage and lead/ asbestos awareness.  Our team is continually maintaining and acquiring site-specific training as is necessary and our in-house Safety Officer regularly updates our extensive Corporate Safety Manual to not only meet, but exceed, industry regulatory standards."

**The Stack Implosion at the Cheswick Station**

36.     Under the terms of the Master Agreement and the Work Authorization, Grant Mackay was obligated to, and represented and warranted that it had or would:

      a.    prepare the Stacks, conduct the implosion, and any cleanup "(i) in a competent and professional manner consistent with industry standards, (ii) in compliance with all laws, statutes and regulations, and (iii) in compliance with all requirements and contents of the Contract Documents, including, without limitation, the Scope of Work, the Drawings and the Specifications, the Insurance Requirements, and the Safety Requirements . . . ."  Master Agreement, Section 7(e).

      b.    "satisfy[y] itself as to the accessibility, general character and physical conditions of the Job Site and the project, the nature and scope of the Work to be conducted at the Job Site and/or in connection with the

project . . . , the character of the equipment and facilities needed for the Work, the general and local conditions under which the Work is to be performed, and all other matters which could in any way affect the Work." Master Agreement, Section 7(g).

c.    "call to CPERG's attention anything of any nature in any drawings, plans, sketches, instructions, information, requirements, procedures, and other data supplied to Subcontractor (by CPERG or any other third party) which it regards in its professional opinion as unsuitable, improper, or inaccurate in connection with the purposes for which such data is furnished." Master Agreement, Section 7(j), p. 5.

37.    On June 2, 2023, Grant Mackay and CDI performed the implosion demolition of the Stacks.

38.    One of the Stacks failed to implode and break apart as intended, causing it to fall with much of the Stack largely intact until it hit the ground.

39.    According to neighboring landowners, this caused an air blast from the end of the Stack, which in turn caused dust and other debris to leave the Station and enter their property. The implosion also knocked down a telephone pole that, in turn, allegedly caused an electrical power surge and a loss of power in the neighborhood.

40.    As discussed below, certain neighboring landowners have claimed that they have suffered property damage and bodily injury as a result of the implosion.

41.    The failure of the Stack to implode as intended, and cause the alleged property damage and bodily injury, was the consequence of:

a.    Grant Mackay's breach of various provisions and representations of the Master Agreement, including Section 1, Sections 7(e) and (g), Section 12(a) and Section 14, and the Work Authorization; and

b.    On information and belief, CDI's negligence in failing to implode the Stacks in a professional, reasonable and proper manner, and in a manner consistent with industry practices.

**The Claims Arising Out of the Stack Implosion**

42.      As a result of the Stack implosion, CPERG is facing and will face a number of claims and increased costs.

43.      First, various of the neighboring property owners have alleged property damage as a consequence of the implosion.  Grant Mackay has been adjusting some of these claims, but, on information and belief, others remain outstanding and unresolved.

44.      Second, certain neighboring landowners ("Injunction Plaintiffs") sued CPERG (incorrectly sued as Charah Solutions, Inc.), Grant Mackay and CDI, among others, in a preliminary injunction action entitled *Ansell, et al v. Charah Solutions*, et al, GD-23-10793, in the Allegheny County Court of Common Pleas (the "Preliminary Injunction Matter").  Because of the June 2, 2023 implosion, the Injunction Plaintiffs sought and obtained a preliminary injunction preventing CPERG from completing other demolition work at the Station.  CPERG, Grant Mackay and CDI appealed the injunction ruling, and the Pennsylvania Superior Court reversed the trial court's grant of the preliminary injunction.  CPERG has incurred legal fees in connection with this injunction action and related appeal and will incur more.

45.      Third, the Preliminary Injunction Matter caused CPERG to incur significant additional costs, including increased demolition costs, attorneys' fees and business interruption losses.

46.      Fourth, Erie Insurance Company has made a subrogation demand against CPERG for $30,747.85 that Erie purportedly paid to its policyholder, Kern Painting (20 Duquesne Court, Springdale, PA 15144-1174) for property damage allegedly arising from the improper implosion of the Stack (the "Kern Claim").

47.     Fifth, CPERG believes that some or all of the neighboring landowners may file a lawsuit against it, Grant Mackay and CDI alleging property damage and bodily injury from the implosion of the Stacks.

48.     Each of these claims arise out of Grant Mackay's and CDI's implosion of the Stacks.

49.     Section 7(i), of the Master Agreement states that Grant Mackay "will be liable for all of its errors, if any, in judgment relative to the Work . . . ."

**CPERG's Communications with Grant Mackay and CDI Regarding the Stack Implosion**

50.     CPERG sent letters to Grant Mackay on October 14, 2023, November 2, 2023 and March 8, 2024 seeking defense and indemnification from Grant Mackay for the claims, liability and increased costs arising out of Grant Mackay's and/or CDI's work at the Station.

51.     Grant Mackay did not respond to the first two letters.

52.     On March 28, 2024, Grant Mackay responded to the third letter and, in breach of Section 7(i), p. 5 and Section 9, p. 7 of the Master Agreement, denied any obligation to reimburse CPERG for any claims, liability or increased costs arising out of Grant Mackay's work at the Station.

53.     On March 13, 2024, CPERG sent a letter to CDI seeking insurance information and demanding that CDI acknowledge its obligation to reimburse CPERG for any claims, liabilities and increased costs arising out of its work at the Station.

54.     CDI has not responded to the March 13, 2024 letter.

55.     On November 19, 2024, pursuant to Section 4(c) of the Master Agreement, CPERG informed Grant Mackay that it has failed to defend, indemnify and hold harmless CPERG for damages CPERG has incurred, including its attorneys' fees and costs, arising from

Grant Mackay's failure to implode the Stacks properly. The notice gave Grant Mackay three days to inform CPERG that it would satisfy that obligation, and Grant Mackay has failed and refused to do so.

**Grant Mackay's Failure and Refusal to Demolish the Boiler House**

56.    In addition to the Stacks, and under the express terms of the Work Authorization, Grant Mackay was obligated to demolish the boiler house.

57.    The trial court in the Preliminary Injunction Matter enjoined demolition by implosion. However, the Pennsylvania Superior Court reversed the trial court, thereby allowing Grant Mackay to go forward with the implosion of the boiler house.

58.    Grant Mackay has failed and refused to do so, despite repeated requests by CPERG. Grant Mackay also conditioned its willingness to demolish the boiler house by conventional means on various actions by CPERG that were not in or required by the Master Agreement or the Work Authorization.

59.    On November 19, 2024, pursuant to Section 4(c) of the Master Agreement, CPERG provided Grant Mackay notice of this breach of its boiler house obligation and gave it three days to inform CPERG that it would demolish the boiler house under the terms of the Work Authorization. Grant Mackay continued to fail and refuse to do so.

**COUNT I – BREACH OF CONTRACT**
**AGAINST GRANT MACKAY (STACK IMPLOSION)**

60.    The allegations set forth in each and every preceding paragraph are incorporated herein by reference.

61.    The Master Agreement and the Work Authorization are valid and binding contracts entered into between Grant Mackay and CPERG.

13

62.    CPERG has performed its obligations under the Master Agreement and the Work Authorization and there were no unperformed preconditions to Grant Mackay fulfilling its obligations under the Master Agreement and the Work Authorization prior to the implosion of the Stacks.

63.    Grant Mackay breached its obligations and representations under Section 1, Sections 7(e), (g) and (i), Section 12(a) and Section 14 of the Master Agreement, and the Work Authorization; by failing to, and/or by making untrue or incorrect statements regarding its obligations to, *inter alia*:

   a.    provide services, facilities, supervision and administration necessary for the proper and complete implosion of the Stacks;

   b.    prepare the Stacks for implosion and perform the implosion (a) in a competent and professional manner consistent with industry standards, and (b) in compliance with all requirements and contents of the Contract Documents, including, without limitation, the Scope of Work, the Drawings and the Specifications, the Insurance Requirements, and the Safety Requirements;

   c.    properly satisfy itself as to the general character and physical conditions of the Job Site and the project, the nature and scope of the Work to be conducted at the Job Site and/or in connection with the project, the character of the equipment and facilities needed for the Work, the general and local conditions under which the Work was to be performed, and all other matters which could in any way affect the Work under the Contract Documents;

   d.    call to CPERG's attention anything of any nature in any drawings, plans, sketches, instructions, information, requirements, procedures, and other data supplied to Grant Mackay (by CPERG or any other third party) which Grant Mackay regarded in its professional opinion as unsuitable, improper, or inaccurate in connection with the purposes for which such data was furnished;

   e.    prepare and properly implode the Stacks in a manner that caused them to collapse in a manner that would not cause alleged property damage and potentially alleged bodily injury;

   f.    conduct an adequate cleanup; and

14

g.    properly supervise CDI to ensure that it performed the explosives work in a manner that caused the Stacks to implode and collapse in a manner that would not cause alleged property damage and potentially alleged bodily injury.

64.    As a direct and proximate result of Grant Mackay's breach of contract and, without limitation, its failure to properly prepare and implode the Stacks, CPERG has suffered monetary damages, and will likely suffer future monetary damages, in a variety of forms, including, *inter alia*:

a.    CPERG has incurred legal fees and costs in defending itself in the Preliminary Injunction Matter and the appeal of that court's decision to the Pennsylvania Superior Court;

b.    For over one-year, CPERG was enjoined from imploding the boiler house at the Station, causing CPERG to incur substantial business interruption losses and significantly increased demolition and other costs, including attorneys' fees; and

c.    Attorneys' fees, costs and liability potentially arising from any claims already asserted, and/or future claims and/or lawsuits filed by neighboring landowners alleging property damage and/or bodily injury from implosion of the Stacks, including, but not limited to, the Kern Claim.

65.    These damages exceed $75,000, exclusive of interest and costs, and continue to grow.

66.    CPERG incorporates the prayer for relief stated below into this Count of the Complaint as if it were set forth in its entirety here.

**COUNT II – BREACH OF CONTRACT**
**AGAINST GRANT MACKAY (INDEMNIFICATION)**

67.    The allegations set forth in each and every preceding paragraph are incorporated herein by reference.

68.    Section 9 of the Master Agreement contains a broad indemnity provision, entitled "Indemnity by Subcontractor," that requires Grant Mackay to indemnify CPERG in connection

with, *inter alia*, claims arising from Grant Mackay's performance of work under the Work Authorization.

69.    CPERG has demanded that Grant Mackay indemnify CPERG under Section 9 for the damages, costs, losses and attorneys' fees and costs that CPERG has incurred and will incur in the future relating to claims arising from the Stack implosion.

70.    CPERG has performed its obligations under the Master Agreement and the Work Authorization and there were no unperformed preconditions to Grant Mackay fulfilling its obligations under the Master Agreement and Work Authorization to indemnify CPERG.

71.    In breach of Section 9, Grant Mackay has expressly refused to indemnify CPERG for such damages, costs, losses and attorneys' fees and costs.

72.    As a direct and proximate result of Grant Mackay's breach of Section 9, CPERG has suffered monetary damages, and will likely suffer future monetary damages, in a variety of forms, including, *inter alia*, having to pay:

   a.    Its legal fees and costs in defending itself against the preliminary injunction claim in the Preliminary Injunction Matter and the appeal of that court's decision to the Pennsylvania Superior Court;

   b.    Its substantial business interruption losses and significantly increased demolition and other costs, including attorneys' fees, relating to demolition of the boiler house; and

   c.    Attorneys' fees, costs and liability potentially arising from any claims asserted, and/or future lawsuits filed by, neighboring landowners alleging property damage and/or bodily injury from implosion of the Stacks, including, but not limited to, the Kern Claim.

73.    These damages exceed $75,000, exclusive of interest and costs, and continue to grow.

74.    CPERG incorporates the prayer for relief stated below into this Count of the Complaint as if it were set forth in its entirety here.

16

## COUNT III – BREACH OF CONTRACT AGAINST GRANT MACKAY
### (BOILER HOUSE)

75.    The allegations set forth in each and every preceding paragraph are incorporated herein by reference.

76.    Under the terms of the Work Authorization, Grant Mackay is to perform "[s]tructural demolition of all existing components of Job Site . . . down to existing grade . . . ."

77.    One of the components identified in the Work Authorization that Grant Mackay is to demolish is the boiler house.

78.    CPERG has performed its obligations under the Master Agreement and the Work Authorization and there were no unperformed preconditions to Grant Mackay fulfilling its obligations under the Master Agreement and Work Authorization to demolish the boiler house.

79.    Because of the alleged property damage and possible bodily injuries arising from Grant Mackay's and CDI's failure implode the Stacks properly, the Injunction Plaintiffs were able to persuade a trial court to issue a preliminary injunction prohibiting CPERG, Grant Mackay and CDI from demolishing the boiler house by implosion.

80.    The Pennsylvania Superior Court has reversed the trial court's grant of the preliminary injunction; however, Grant Mackay refuses to perform demolition of the boiler house by implosion or by conventional demolition.

81.    CPERG will have to retain a different subcontractor to perform the demolition of the boiler house, likely at an increased cost.  These substantially increased costs are the direct consequence of Grant Mackay's breach of contract and CDI's negligence in improperly imploding the Stack.

82.    CPERG has authorized and ordered Grant Mackay to demolish the boiler house by implosion or by conventional demolition.

83.    Grant Mackay has refused to do so unless CPERG agrees to various conditions not set forth in the Master Agreement and the Work Authorization.

84.    Grant Mackay's refusal to demolish the boiler house by any means and without requiring a release of liabilities constitutes a breach of the Master Agreement and the Work Authorization.

85.    As a direct and proximate result of Grant Mackay's breach, CPERG has suffered monetary damages, and will likely suffer future monetary damages, in a variety of forms, including, *inter alia*, having to find and retain a different subcontractor to demolish the boiler house, additional costs associated with such demolition, business interruption losses and attorneys' fees.

86.    These damages exceed $75,000, exclusive of interests and costs, and continue to grow.

87.    CPERG incorporates the prayer for relief stated below into this Count of the Complaint as if it were set forth in its entirety here.

### COUNT IV – STRICT LIABILITY COUNT AGAINST CDI

88.    The allegations set forth in each and every preceding paragraph are incorporated herein by reference.

89.    By undertaking blasting activities and by imploding the Stacks with explosives, CDI engaged in an abnormally dangerous activity.

90.    CDI's blasting activities failed to properly implode the Stacks and allegedly caused property damage and bodily injury to neighboring landowners.  This alleged property damage and bodily injury is precisely the kind of harm that makes such blasting activities abnormally dangerous.

18

91.     On its website, CDI recognizes that blasting activities pose potential property damage and bodily injury of the type that its improper implosion activity allegedly caused to landowners in the neighborhood of the Station.

92.     As a direct and proximate result of CDI's improper blasting activities, CPERG has suffered monetary damages, and will likely suffer future monetary damages, in a variety of forms, including, *inter alia*:

a.      Its legal fees and costs in defending itself in the Preliminary Injunction Matter and the related appeal;

b.      Its substantial business interruption losses and significantly increased demolition and other costs, including attorneys' fees; and

c.      Attorneys' fees, costs and liability potentially arising from any claims asserted, and/or future lawsuits filed by, neighboring landowners alleging property damage and/or bodily injury from implosion of the Stacks, including, without limitation, the Kern Claim.

93.     Regardless of any care, if any, CDI took to prevent resulting harm, CDI is strictly liable for the damages that it caused CPERG by engaging in blasting activities to demolish the Stack.

94.     These damages exceed $75,000, exclusive of interest and costs, and continue to grow.

95.     CPERG incorporates the prayer for relief stated below into this Count of the Complaint as if it were set forth in its entirety here.

## COUNT V – NEGLIGENCE COUNT
## AGAINST CDI

96.     The allegations set forth in each and every preceding paragraph are incorporated herein by reference.

97.     CDI had a duty to CPERG to perform its implosion work, and all tasks necessary to perform that work, at the Station in a professional manner consistent with industry standards and practices.  It was or should have been foreseeable to CDI that if CDI failed to perform any of its work at the Station in a professional manner consistent with industry standards and practices, the Stacks would not implode and collapse as intended, causing possible property damage and bodily injury.

98.     CDI also had a duty to CPERG to exercise ordinary care in performing its implosion work, and all tasks necessary to perform that work, at the Station.  It was or should have been foreseeable to CDI that if CDI failed to exercise ordinary care and perform any of its work at the Station in a professional manner consistent with industry standards, the Stacks would not implode and collapse as intended, causing possible property damage and bodily injury.

99.     CDI also had a duty to CPERG to take steps to avoid foreseeable injury, such as property damage and bodily injury, resulting from an improper implosion.

100.    On information and belief, CDI acted negligently by, *inter alia*, failing to properly prepare for and then perform the implosions of the Stacks.  By negligently failing to do so, on information and belief, CDI breached its duties to CPERG to (i) perform its implosion work, and all tasks necessary to perform that work, at the Station in a professional manner consistent with industry standards and practices; (ii) exercise ordinary care to perform its implosion work, and all tasks necessary to perform that work, at the Station; and (iii) to take steps to avoid foreseeable injury, such as property damage and bodily injury resulting from an improper implosion.

101.    On information and belief, CDI's failure to prepare for and carry out the implosion of the Stacks in a proper and professional manner constituted negligence, including professional negligence.

102.    On information and belief, CDI's negligence, including its professional negligence, and its failure to satisfy, *inter alia*, the duties identified above has caused CPERG monetary damages, including, *inter alia*:

> a.    Its legal fees and costs in defending itself against in the Preliminary Injunction Matter and the related appeal;
>
> b.    Its substantial business interruption losses and significantly increased demolition and other costs, including attorneys' fees; and
>
> c.    Attorneys' fees, costs and liability potentially arising from any claims asserted, and/or future lawsuits filed by, neighboring landowners alleging property damage and/or bodily injury from implosion of the Stacks, including, but not limited to, the Kern Claim.

103.    These damages exceed $75,000, exclusive of interest and costs, and continue to grow.

104.    CPERG incorporates the prayer for relief stated below into this Count of the Complaint as if it were set forth in its entirety here.

## COUNT VI – DECLARATORY JUDGMENT
## AGAINST GRANT MACKAY

105.    The allegations set forth in each and every preceding paragraph are incorporated herein by reference.

106.    Under the Master Agreement, Grant Mackay represented that:

> a.    it was "equipped [and]organized to perform the Work . . . under the Contract Documents."  Section 14;
>
> b.    it would "cause the Work to be performed (i) in a competent and professional manner consistent with industry standards, (ii) in

compliance with all laws, statutes and regulations, and (iii) in compliance with all requirements and contents of the Contract Documents, including, without limitation, the Scope of Work, the Drawings and the Specifications, the Insurance Requirements, and the Safety Requirements . . ."  Section 7(e).

c.      it had "satisfied itself as to the accessibility, general character and physical conditions of the Job Site and the project, the nature and scope of the Work to be conducted at the Job Site and/or in connection with the project . . . , the character of the equipment and facilities needed for the Work, the general and local conditions under which the Work is to be performed, and all other matters which could in any way affect the Work. . . under the Contract Documents or the Fee . . . ."  Section 7(g).

d.      it would "be liable for all its errors, if any, in judgment relative to the Works . . . ."  Section 7(i).

e.      it would "call to CPERG's attention anything of any nature in any drawings, plans, sketches, instructions, information, requirements, procedures, and other data supplied to Subcontractor (by CPERG or any other third party) which it regards in its professional opinion as unsuitable, improper, or inaccurate in connection with the purposes for which such data is furnished."  Section 7(j).

107.   Each of these representations was untrue and/or incorrect.  Among other things, Grant Mackay was not equipped and organized to perform the Work; did not cause the work to be performed in a competent and professional manner consistent with industry standards, and in compliance with all laws, statutes and regulations, in compliance with all requirements and contents of the Contract Documents; did not satisfy itself properly as to the general character and physical conditions of the Job Site and the project, the nature and scope of the Work to be performed, the character of the equipment and facilities needed for the Work, the general and local conditions under which the Work is to be performed, and all other matters which could in any way affect the Work under the Contract Documents; and it has not accepted liability for its errors in judgment relative to the Work.

108.    On information and belief, Grant Mackay denies that these representations were untrue and/or incorrect.

109.    Grant Mackay was also obligated under the Master Agreement and Work Authorization to:

     a.    Prepare the Stacks for and perform structural demolition through implosion of the Stacks, and conduct cleanup;

     b.    "provide and furnish all labor, materials, tools, supplies . . . services, facilities, supervision and administration necessary for the proper and complete provision of the Work by Subcontractor and acceptance of the Work by CPERG"; and

     c.    demolish the boiler house.

110.    Grant Mackay failed to perform these obligations properly.

111.    Grant Mackay has denied that it failed to perform these obligations.

112.    Under Section 9, of the Master Agreement, Grant Mackay has an obligation to defend, indemnify and hold harmless CPERG against any and all "Claims," as that word is defined therein, relating to its work at the Station.

113.    Grant Mackay has denied that it has an obligation to defend, indemnify and hold harmless CPERG regarding consequences of the Stack implosion, and has refused to pay, *inter alia*, CPERG's attorneys' fees and costs arising from the Preliminary Injunction Matter, refused to indemnify CPERG for the Kern Claim and, on information and belief, has not addressed certain claims that neighboring landowners have made to date.  Further, Grant Mackay has informed CPERG that it will not defend, indemnify or hold harmless CPERG regarding any future lawsuit or claims that individuals who allegedly suffered property damage or bodily injury from the Stack implosions may assert or file in the future.  In addition, Grant Mackay has refused to demolish the boiler house, causing CPERG the variety of damages stated above.

23

114.    For these reasons, an actual controversy exists between CPERG and Grant Mackay regarding Grant Mackay's obligations under the Master Agreement and the Work Authorization.

115.    A determination by the Court of the rights, duties and obligations of CPERG and Grant Mackay under the Master Agreement and the Work Authorization is necessary and proper to terminate and resolve the parties' controversies and disputes and to allow the parties to assess their respective positions.

116.    Under 28 U.S.C. § 2201 *et seq*, CPERG is entitled to a necessary declaration by this Court of its rights and Grant Mackay's duties under the Master Agreement and the Work Authorization.

## PRAYER FOR RELIEF

WHEREFORE, CPERG respectfully requests that this Court enter judgment in favor of CPERG and against Grant Mackay and CDI and award CPERG the following relief:

1.    Damages in an amount to be proved at trial.

2.    CPERG's reasonable attorneys' fees, costs, and interest, including as required under, *inter alia,* Sections 9 and 19 of the Master Agreement.

3.    A declaration that Grant Mackay has breached the Master Agreement and the Work Authorization, including, without limitation, Section 1, Sections 7(e), (g) and (i), Section 9, Section 12(a) and Section 14 of the Master Agreement, and the Work Authorization, and that (i) Grant Mackay is obligated to pay CPERG its monetary damages established at trial from these breaches; (ii) Grant Mackay is obligated to defend, indemnify and hold harmless CPERG from future Claims, as defined in Section 9 of the Master Agreement; and (iii) Grant Mackay is obligated

to pay CPERG its increased demolition costs for Grant Mackay's refusal to perform its obligation to demolish the boiler house.

4.    Any other and further relief as this Court deems equitable, just, and proper.

## JURY TRIAL DEMANDED

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, CPERG demands a jury trial in this action of all issues so triable.

Dated:  November 25, 2024                    Respectfully submitted,

/s/ *Laura K. Veith*
Michael J. Lynch
P.A. Bar ID No. 35125
Laura K. Veith
P.A. Bar ID No. 321680
K&L GATES LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA 15222
Telephone: (412)-355-6500
Facsimile: (412)-355-6501
Email: mike.lynch@klgates.com
Email: laura.veith@klgates.com

*Counsel for Cheswick Plant Environmental Redevelopment Group, LLC*